Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEXANDRA, BENJAMIN, and JENNIFER MARTIN,<br><br>Plaintiff(s),<br><br>v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR PERSONAL INJURIES<br><br>JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs Alexandra ("Alex") Martin and her parents, Benjamin ("Ben") and Jennifer Martin, bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") (collectively, "Meta"), and allege as follows:

# I.    INTRODUCTION

**A.    Plaintiffs' Claims**

1.    This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Meta and, specifically for the injuries it caused Alex Martin beginning in 2014, when Alex was only twelve years old. Those injuries, proximately caused by Meta's unreasonably dangerous Instagram social media product, include but are not limited to, addiction, anxiety, depression, eating disorders, and, ultimately, suicide attempts.

2.    Meta's Instagram social media product likewise caused foreseeable harms to Plaintiffs Ben and Jennifer Martin. Ben and Jennifer Martin took affirmative steps to protect their daughter, were unaware that Meta's Instagram product was addictive and harmful and were emotionally and financially harmed by Meta's addictive design and harmful distribution and provision of multiple Instagram accounts to their child.

3.    Plaintiffs' harms were all caused by Alex's exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. Alex was 12 years old when she opened her first Instagram account. Meta knew or should have known that she was under the age of 13, however, Meta designed its product to encourage such illegal and unauthorized use, and in a manner that encouraged Alex to eventually open multiple accounts, including secret accounts her parents did not know about.

4.    Meta created a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and product features, then operated its algorithms to push and promote harmful content via Alex's Feed, Explore, Stories, and Reels features. Meta programmed and operated its product to prioritize engagement over user safety, and Alex suffered several emotional, physical, and financial harms as a result, as did her parents—all of which are a symptom of the current health crisis among American youth caused by certain harmful social media products, specifically in this case, Instagram.

**B.    Meta's Internal Documents Targeting Children**

5.    In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Meta's Instagram social media product in its current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

6.    The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

> a.    <u>Social Comparison: Topics, celebrities, Like counts, selfies</u> [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

> b.    <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

> c.    <u>Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues</u> [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

> d.    <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

  e. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

 7. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

  a. Why We Build Feeds

  b. Is Ranking Good

  c. Big Levers Ranking Experiment

  d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

  e. MSI Metric Note Series

  f. The Meaningful Social Interactions Metric Revisited: Part 2

  g. The Meaningful Social Interactions Metric Revisited: Part 4

  h. The Meaningful Social Interactions Metric Revisited: Part 5

  i. Meaningful Social Interactions Useful Links

  j. MSI Documentation

  k. Evaluating MSI Metric Changes with a Comment-Level Survey

  l. Surveying The 2018 Relevance Ranking Holdout

  m. Overview of MSI + Pages and Survey Research

  n. Is Multi-Group Picker "Spammy?"

  o. Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

  p. [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

  q. Planned MSI Metric Changes in 2020

  r. MSI Metric Changes for 2020 H1

  s. Should We Reduce the MSI Weight of Sticker Comments?

  t. Max Reshare Depth Experiment

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

u.   "Understand This Post's Ranking" —How I Miss Thee!

v.   Facebook and Responsibility

w.   The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.   One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.   News Feed UXR Quarterly Insights Roundup

z.   What Happens If We Delete Ranked Feed?

aa.  News Feed Research: Looking Back on H2 2020

bb.  Content from "Political" Pages in In-Feed Recommendations

cc.  Political Content in In-Feed Recommendations (IFR)

dd.  In-Feed Recommendations HPM —April 15 2021

These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claim.

8.     On information and belief, Meta has knowledge about the harms its products cause users, particularly teen, child, and other vulnerable user populations, and continues to operate those products in a harmful and dangerous manner anyway and in the interest of competitive advantage and increasing its already astronomical profits. Moreover, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what Meta done in the name of corporate greed.

9.     Meta has actual knowledge that children under the age of 13 are using its social media products; that its social media products are highly addictive and harmful to a significant population of all users, but especially teens and children; that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes") are causing harm to users, but especially teens and children; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Meta knew about these harms,

could have made its Instagram product safer at minimal expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

10.    Despite knowledge of the dangerous and harmful characteristics of its product, Meta has made and continues to make calculated cost-benefit business decisions and is consistently prioritizing their already astronomical profits over human life.

11.    The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

**C.    The Social Media Epidemic Among Children**

12.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Meta.

13.    The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

14.    By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means tens of millions of U.S. teens (aged 13 to 17) using Meta's social media product on a regular basis.

15.    By 2018, an estimated 63% of all children in the United States aged 13 to 14 and 78% of all children in the United States aged 15 to 17 used Instagram specifically. Current estimates put the total number of all US teens using Instagram at 76%.

16.     Current estimates put the number of teen Instagram users in the US over 20 million – in other words, there are more than 20 million at-risk teen Instagram users in the U.S. alone.

**D.     Disparities Between Meta's Public Statements and Internal Research on Harm to Children**

17.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as the cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Again, Meta has spent years publicly denying these findings—while internally confirming them.

18.     Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe. Even its Terms of Use (effective January 4, 2022) represent that Meta is "Fostering a positive, inclusive, and safe environment," and that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." (Effective January 4, 2022). However, Meta's own internal research and "experiments" show the opposite. The Facebook Papers include years' worth of studies and reports, often referred to by Meta as "experiments," discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and what Meta refers to as Suicide and Self Injury (or, SSI). The following are just a few examples.

19.     The Facebook Papers, however, include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research

confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See, supra*, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29 (referring to its own product mechanics as "addicting."



---
[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf



*Id*. at p. 29, 30. More to the point, Meta knows that "Aspects of Instagram exacerbate each other to create a perfect storm." *Id*. at p. 33 and 34. According to Meta, the "social comparison sweet spot" (*id*.)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of Meta's product model and product features,

*Id.* at p. 33 and 34.

20.     The user harms acknowledged in these slides relate, ultimately, to Meta product features like "Feed + Profile and Explore" (*id.*), filters, and teen-targeted marketing and accessibility. Meta refers to its "product mechanics" as "addicting" and recognizes that it is not certain body-focused celebrity content shown on Instagram causing harm, but rather, the sheer volume at which Meta's social media product identifies and targets individual users (in particular, teen girls) with that body-focused content. Indeed, this is not even content these users have searched for or, in many cases, want to see – but rather, it is content (including advertisements) Meta itself has programmed its product, algorithms, and other technologies to target at individual users as a means of increasing engagement and addiction; and, in turn, Meta's revenue and competitive positioning.  Meta knows exactly the harms that its products are causing to its teen users, yet Meta leadership has made the decision to stay focused on engagement and growth, at the expense of safety (aptly referred to by Meta as "Integrity").

21.     Meta also knows that its recommendations and other product features, like Feed and Explore, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women (known as "algorithmic bias" and/or "algorithmic discrimination")/ Yet Meta continues to reap astronomical profits at the expense of these users.

22.     To name only one example, Meta knows that its algorithm is identifying and pushing harmful social comparison content to teen <u>girls</u> at significantly higher rates than what it is

identifying and pushing to teen <u>boys</u>. Meta's algorithm is discriminating in a manner that disproportionally targets girls between the ages of 13 and 17, as compared to similarly situated boys between the ages of 13 and 17. And Meta has no intention of stopping, because this discrimination has proven lucrative and until it is more expense for Meta to keep discriminating against young women it will continue to do so.

23.     In the words of the Facebook Whistleblower, Meta is "morally bankrupt."

24.     Meta knows of several other product features that are harming its users, and which Meta could reasonably make safer – but where Meta has chosen engagement and growth over integrity every time. Another example is the "friend" recommendation product feature, which is a feature Meta has in both its Facebook and Instagram social media products. Meta knows that this feature is harmful to children in that it contributes to a significant amount of the grooming and exploitation that occurs on and because of Meta's platforms. In other words, Meta affirmatively directs and connects predatory adult users who do not know and would not be able to find minors otherwise to Meta's minor users via its recommendation algorithms, and vice versa (directing minors to adult users). Meta is aware of the harm this product is causing to a substantial number of its minor users. However, Meta has refused to simply turn this function off for minor users – which it can easily do – because of other and more general findings that the more connections Meta can make for new users, the more likely those users are to keep using its product.

25.     Meta's own research has also been quite conclusive in determining that its teen, female users are disproportionately impacted by these products features and resulting harms,

1



*Id.* at p. 9.

26.     According to an article published by the Wall Street Journal,[4]

> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

27.     Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people,"

_____

[4] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739



## Teens blame Instagram for increases in the rates of anxiety and depression among teens

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

*"The reason why our generation is so messed up and has higher anxiety and depression than our parents is because we have to deal with social media. Everyone feels like they have to be perfect."*
*- UK Female*

*See, supra,* "Teen Mental Health Deep Dive," p. 27.  (October 10, 2019), at p. 53. As illustrated in the Facebook Papers, this constant and harmful social comparison is the result of social media's design and operation, and not any one piece of content or interaction on its platform.

28.     Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,

*See*, https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive."

29.     Meta knows that its product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's priority is growth and competition concerns, and it sees "acquiring and retaining" teens as essential to its survival. As made clear in the Facebook Papers, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns Meta links to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

30.     Meta also knows that its Instagram product is widely used by pre-teens under the age of 13. Despite it being illegal for Meta to knowingly permit persons under the age of 13 to use its platform, Meta has spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make its product more appealing to and increase engagement among them. Meta sees children under 13 as a tappable and valuable market, which it must capture and use to increase revenue and ensure competitive positioning in the long-term.

31.     For Meta, young users are a priority demographic, and Meta leadership will do anything to increase and maintain engagement. Indeed, on October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[5]

32.     Meta spends billions on these efforts, going so far as to identify vulnerabilities and other areas where it can adjust its products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

33.     Identified among Meta's internal documents are other product features that cause

---

[5] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

1    harm to teen users, which product features are relatively standard among Defendants' products.

2    For example, product features that enable users to like or love other user's content results in

3    increased addiction and social comparison harms, which Meta considered hiding for the benefit of

4    its users (referred to as "Project Daisy") but ultimately did not.[6]

5         34.    In May 2022, Instagram head Adam Mosseri told reporters that that research he had

6    seen suggests the app's effects on teen well-being is likely "quite small."[7] Upon information and

7    belief, Mr. Mosseri's statement was false and Meta leadership, including Mr. Mosseri, has been

8    made aware of the significant and far-reaching effects of Instagram on teen well-being.

9
    The features that Instagram identifies as most harmful to teens
    appear to be at the platform's core.

10
    The tendency to share only the best moments, a pressure to look

11  perfect and an addictive product can send teens spiraling toward
    eating disorders, an unhealthy sense of their own bodies and
    depression, March 2020 internal research states. It warns that the

12  Explore page, which serves users photos and videos curated by an
    algorithm, can send users deep into content that can be harmful.

13
    "Aspects of Instagram exacerbate each other to create a perfect
    storm," the research states.

14
    The research has been reviewed by top Facebook executives, and was

15  cited in a 2020 presentation given to Mr. Zuckerberg, according to the
    documents.

16    *See https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-*

17    *documents-show-11631620739* (to name only one example).

18         35.    In a more recent interview, Mr. Mosseri said that some features of Instagram could

19    be harmful to some users, and they aren't easily addressed.[8] This statement was also false, as

20    Meta's leadership, including Mr. Mosseri, have been presented with numerous recommendations

21    from Meta's employees and even teens themselves as to how they could <u>easily</u> make the Instagram

22    product safer for children and teens. Examples of this include but are not limited to things such as,

23              a.   Verification of age and identify for all users.

24              b.   Email verification for all users.

25              c.   Not allowing multiple accounts.

26    _____

27    [6] *See https://www.nytimes.com/2020/01/17/business/instagram-likes.html*

28    [7] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

[8] *Id.*

d.  Not allowing public profiles for minors, or defaulting minors to private ones.

e.  Not allowing direct messaging with minors, or not allowing direct messaging with minors and persons not on their "friends" list.

f.  Turning off recommendation algorithms for minor accounts.

g.  Turning off content algorithms for minor accounts.

h.  Reducing amount of certain content categories Meta's algorithms identify and direct to minor users (where Meta has determined that even a small reduction to quantity would have a large impact for users, and where Meta can make such a change essentially by turning a level on its current settings).

i.  Not creating, approving, and directing harmful advertisements to minors.

j.  Adoption of SSI (Suicide and Self-Injury) tools Meta employees have recommended and, again, that Meta could implement on a unilateral basis and that would reduce the incidence of SSI caused by Instagram.

36.  Meta knows that teens are more vulnerable and suffer harms from use of the Instagram social media product at higher rates than adult Instagram users. At the same time, however, teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its Instagram social media product as appealing to teens as possible, even though it is harmful to teens.

**E.  Meta's Singular Focus on Profits Over Safety**

37.  Meta knows the harmful impact its products have. Instead of warning users and/or re-designing its product to make it safer, however, Meta senior leadership conducts extensive economic calculations and chooses enhancing profits over protecting human life.

38.  Meta knows that large numbers of its users are "addicted" to its social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Meta has designed its product to encourage through psychological manipulation techniques— sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

39.  Meta also slowly switched its News Feed (in its Facebook and Instagram products)

from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users.

40.     Meta likewise knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has tested and proved these theories and is aware of product fixes that would cost Meta virtually nothing but that, in turn, would reduce the harms to Meta's teen users – users like Alex Martin. But Meta leadership refused such changes due to the potential for decreased revenues from advertisers and influencers. In other words, Meta made a calculated business decision and chose profits over human life.

41.     Meta likewise engages in a constant cost-benefit analysis when it comes to user safety vs. engagement—with engagement winning every time. For example, Meta does not incorporate reasonable and necessary safety protocols and checks into its design and development processes. It also then fails to make its product and product features safer after concerns are voiced and/or actual harms are known. It opts instead for profits and engagement, consistent with its well-known motto, "Move fast and break things." On information and belief, there will be multiple examples of this once discovery is had in this case.

42.     Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

43.     Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones. The following are just some examples.

44.     Meta now claims that it requires age verification, which claim is misleading. Meta simply asks its users to input their birthdate, as it did upon opening of the account. This form of

"verification" is no more effective than it was the first time. Meta is unwilling to actually verify age and identification, however, as this would prevent anyone under the age of 16 from opening an account without parental consent and would stop those same users from opening multiple accounts – which would have significant impact on Meta's engagement numbers and resulting revenue. It would also decrease engagement among predatory users, as many would not sign up for fear of getting caught and those who did would be easier to identify.

45.    Meta also claims that it has parental controls in place, which "parental controls" Meta knows to be ineffective. For example,

    a.  Parental controls do not work when users open accounts without their parents' knowledge or consent (which is many if not most teen users);

    b.  Parental controls do not work when users open FINSTAS (or secret, secondary accounts) which their parents do not know about, which again, refers to more than half of all teens using Meta's Instagram product.

    c.  Parental controls do not work because, as Meta also knows, most parents do not understand how to use Meta's social media products in the first place, and cannot or do not use what they do not understand. *See, supra,* "Teen Mental Health Deep Dive" (p. 50),

That is, actual user safety requires implementing more than just a tool aimed at putting safety in the hands of parents, since most do not understand the tool or know it exists in the first place.

      d.    Whatever the reason for parents not using parental controls, that misses the point entirely – which is that Meta does not have the right to distribute inherently dangerous and defective products to children in the first place, and parental controls do not address harmful product features like algorithms and social comparison content, to name a few.

## F.    Overview of Claims

46.    Plaintiffs bring claims of strict liability based upon Meta's defective design of its Instagram social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost. In fact, Meta's employees have made proposals for product changes time and time again, as is also proven by Meta's internal documents, only for Meta controlling shareholder and CEO Mark Zuckerberg to refuse such changes based solely on the potential impact they might have to Meta's engagement and revenue numbers. The following is from a Wall Street Journal article published September 15, 2021,[9]

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote about the briefing. One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.
>
> "Mark doesn't think we could go broad" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "We wouldn't launch if there was a material tradeoff with MSI impact."

47.    What's clear from all of these reports and documents is that Meta and its competitors in the social media space *could* provide social media products that do not promote or

---

[9] https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215

amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

48.    Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

49.    Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The addictive quality of Instagram and its harmful algorithms are unknown to minor users and their parents.

50.    Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Instagram social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Instagram product.

51.    Meta's own former and/or current developers often do not allow their own children and teenagers to use the Instagram product.[10] For many years, Meta has had actual knowledge that its Instagram social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

52.    Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

53.    Plaintiffs also bring a claim for unjust enrichment. Defendant received a direct benefit from Alex Martin's problematic and harmful use of its product, both from the amount of time she spent on Instagram and from her creation of multiple accounts. Under the circumstances stated herein, it would be unjust and inequitable for Defendant to retain those ill-gotten benefits.

---

[10] *See*, *e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

54.     Plaintiffs bring a claim for invasion of privacy under California law. Defendant's conduct detailed herein frustrated and intruded upon Ben and Jennifer Martin's fundamental parental rights to protect their child and to monitor and control their child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

55.     Finally, Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent years lying to Congress and the public about the nature of its products and harms they cause. Meta made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Meta was prioritizing user safety over its own profits. Meta not only knew that these statements were false but was actively concealing the truth by creating a corporate culture of fear – conscientious Meta employees were made to believe that they would be ruined and not believed, and that their actions would result in others not being able to make Meta's products safer if they revealed the truth. Meta knew that its products were not safe, and knew that children, like Alex Martin, would be harmed by their use.

56.     Plaintiffs' claims do not arise from third party content, but rather, Meta's product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity, put minor users in contact with dangerous adult predators, and otherwise prioritize engagement (and Meta profits) over user safety.

## II.     PARTIES

57.     Plaintiffs Alex Martin, and her parents Ben and Jennifer Martin, reside in Georgetown, Kentucky. Alex opened her first Instagram account sometime in 2014, when she was 12 years old. Upon information and belief, Meta required her to assent to its Terms of Service at that time. Alex no longer uses the Instagram social media product and disaffirms any contractual terms Meta might claim. Disaffirmation was made within a reasonable time of Alex's eighteenth birthday.

58.     Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram social media

platforms, applications that are widely available to users throughout the United States.

### III.     JURISDICTION AND VENUE

59.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states.

60.     This Court has general jurisdiction over Defendant Meta because Meta's principal place of business is California and Meta is "at home" in this State. This Court also has specific jurisdiction over Meta because Plaintiffs' claims set forth herein arise out of and relate to Meta's activities in the State of California.

61.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.     FACTUAL ALLEGATIONS RELATING TO PRODUCT DEFECTS

**A.     Facebook and Instagram Background**

62.     Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

63.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

**News Feed Product**

64.     Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

65.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

66.     Over time, Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though Meta knows that maximizing sessions is harmful to its users.

67.     Recommendation-based feeds and product features also promote harmful content, particularly where, as in the case of Meta, the algorithm is being programmed to prioritize number of interactions and not quality of interactions.

68.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See*  https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

69.    And again, Meta's recommendations are not coincidence, nor are they the product of third-party speech or even Meta's speech. Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Meta is not targeting millions, thousands, or even hundreds of users with its product. Meta's technologies allow it to target every single user (billions of people) simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than anything American courts and lawmakers have ever seen or could even have conceived of until Meta's internal

documents were released in late 2021. Even now, there are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

70.     Meta not only tracks user actions, it tracks every conceivable detail of usage, including intentional vs. nonintentional actions, every message sent and received, every like, detailed usage and engagement and growth statistics *for every single user*, which data Meta can then access, organize, and utilize based on date, location, and age. In short, and upon information and belief, Meta's systems provide Meta with actual knowledge as to virtually everything that occurs on its platform.

71.     Meta is willing to addict its users if it means Meta's own long-term success.

72.     Meta has had almost a decade to fix the type of product defects identified Senators Richard Blumenthal, Marsha Blackburn and Mike Lee in late 2021, but has not—instead, its products have severely harmed millions of teens in the U.S. alone, including Alex Martin.

### **Explore Product**

73.     Instagram has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for purpose of ensuring continued growth, engagement, and revenue increase.



*See, supra*, "Teen Mental Health Deep Dive," p. 54.

74. Meta also has conducted studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. *See, e.g.*, *supra*, "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." Despite being able to identify the harmful categories, as well as volume and amplification product defects causing harm, Meta ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens. Meta decided against changing its current product as a result, and irrespective of identified harms.

75. Meta also knows that these harms (caused by Instagram) disproportionately impact protected groups, including young women; and that its product disproportionately targets protected groups, including young women.

**Profile Settings**

76. Instagram profile default settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users.

77.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increases user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Meta is aware of the harm and has opted to not make necessary and cost-effective changes to prevent it.

**Direct Messaging Product Feature and Access to Vulnerable Users**

78.     Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens.

79.     Meta's direct messaging feature is where most unwanted interactions happen, including bullying and sexual exploitation of minors, which Meta knows, yet it has once again opted to not make necessary and cost-effective changes to prevent these harms – opting for engagement over safety.

**Push Notifications and Emails**

80.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram product. Based on individualized data Meta collects, it then selects content and notification frequency for its users and notifies them via text and email. Instagram's notifications to individual users are designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

81.     Upon information and belief, Meta has programmed its systems such that its programs send more of these notifications to its most addicted users, knowing that these users are the ones who have a harder time resisting the allure of this product feature.

1

### Reels and Stories

2    82.    Instagram has also added features and promoted the use of short videos and

3  temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram

4  "Stories." These products were developed to appeal to teens and Meta knows that these products

5  are addictive, as well as defective.

6    83.    To name only one example, Meta has not yet implemented certain, basic safety-

7  related technologies across all product features – despite public representations to the contrary –

8  while the algorithmic bias it operates within its algorithms is identifying and promoting these

9  inherently riskier products in greater numbers to teens, women, and other minority groups. This

10  means, for example, that Meta is identifying and recommending harmful and eating-disorder

11  promoting content to young girls in higher numbers – as it did with Alex Martin. This is content

12  these users would never have seen but for Meta's identification and promotion, which harms Meta

13  knew about but did nothing to correct as it prioritized keeping the attention of those teen users.

14

### Marketing to Kids and Social Comparison Product Features

15    84.    Instagram also incorporates several unique product features that serve no functional

16  purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and

17  filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison

18  pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features

19  disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on

20  its economic bottom line—rejects product change recommendations that would have better

21  protected users against these harms and at minimal implementation cost to Meta.

22    85.    Another example involves Meta's "like" button feature. Meta has determined that

23  its "like" product feature is a source of social comparison harm for many of its users. This is not

24  surprising given that several of the Meta employees involved in creating that feature have since

25  left Meta and have spoken publicly about the product's addictive nature and harmfulness.[11] What

26  is surprising, however, is that Meta identified the harmful feature (the "like" button), is aware of a

27  low to no-cost solution that would reduce the harms to its users, and still made the business

28

---

[11] *See*, *e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

decision to *not* launch that product fix.  This is another blatant example of Meta choosing profits over human life and, specifically, the health and well-being of teens.

86.     Upon information and belief, multiple Meta employees recommended and/or supported the launch of this product change for the Instagram product, but Meta leadership said no. And this specific feature was a source of significant emotional and mental harm to Alex Martin.

## Meta's Ownership and/or Licensing Rights in all User Content

87.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

88.     Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[12]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[12] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

89.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

90.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

91.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

92.     Meta's products are used by many millions of children every day.

**B.     Meta's Instagram Application is a Product**

93.     There can be no dispute that Meta designs, manufactures, and distributes Instagram. Meta refers to Instagram and its various product features internally and in public facing documents as a "product."

94.     Meta's Instagram product is designed to be used by minors and is actively marketed to teens across the United States.

95.     Meta has obtained countless patents in connection with its Instagram product, which legal protection it would not be entitled to for mere editorial decisions.

96.     The Instagram product is designed to be used by minors and is actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. In addition, Meta works with and actively encourage advertisers to create ads targeted at

and appealing to teens, and even to children under the age of 13. Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

97.     Meta also is aware that large numbers of children under the age of 18 use its product without parental consent. Indeed, Meta designs its social media product in a manner intended to allow and not prevent such use.

98.     Meta is likewise aware that large numbers of children under the age of 13 use its product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their product in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase its own profits.

**C.     Meta Knows That Its Facebook and Instagram Products are Highly Addictive**

99.     Meta and its leadership have repeatedly represented to the public and governments around the world that their Instagram and Facebook products are safe and not addictive.

100.     In September of 2017, Meta CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too."[13]

101.     In April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[13] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[14]

102.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[15]

103.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.

He was asked:

> "So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health? ..."

He responded:

> "I don't think that the research is conclusive on that…"

He was asked:

> "Do you agree that you make money off of creating an addiction to your platforms?"

He responded:

> "Congressman, no. I don't agree with that."

He was asked:

> "Do you believe that your platform harms children?"

He responded:

> "Congresswoman, I don't believe so.  This is something that we study and we care a lot about; designing products that  peoples' well-being is very important to us.  And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that. And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services."[16]

104.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive. She testified that she "disagree[d] with calling our product addictive. I also think that's not how we build products."[17] She denied Meta's

---

[14] https://www.youtube.com/watch?v=AB4mB-K7-xY

[15] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[16] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[17] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

marketing to children under 13, repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[18]

105.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive.[19] He testified that teens come to Instagram while dealing with difficult things and that Instagram makes things better for them. Mr. Mosseri downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[20] Indeed, he testified that Meta's overarching goal is child safety: "But I want to assure you that we do have the same goal. We want all teens to be safe online."[21]

106.    In truth, Meta has been studying its "addicting" product mechanics for years, and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that these products are addictive and harmful to children and teens. Moreover, Meta's own estimates reflect known addiction by a significant number of children and teens. For example, if we assume an addiction rate among US teen users only of 3%—which is *far lower* than Meta's estimated—that means that more than *half a million* American teenagers (age 13 to 17) are currently addicted to Instagram to the point where their addiction is causing sleep deprivation, actively interfering in their friendships, family relationships, employment, and education, and is causing other physical and emotional harms.

107.    In March of 2020, Meta internally published a document titled "Social Comparison Exploratory Research" (*see, supra*, as published by WSJ) based on a US Exploratory Study it

---

[18] *Id*. at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[19] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[20] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[21] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

conducted titled "Teen Girls Body Image and Social Comparison on Instagram,"



108.    In that document, Meta refers to its Instagram product mechanics as "addicting,"



*Id.* at p. 29.

109.    Among the published Facebook Papers are other documents detailing studies specific to the issue of teen users and mental health, including the fact that teens "have an addicts' narrative about their use – it can make them feel good, feel bad. They wish they could spend less time caring about it, but they can't help themselves …" and "Teens recognize the amount of time they spend online isn't good for them but at the same time they know they lack the willpower to control the time spent themselves."



*See, supra*, "Teen Mental Health Deep Dive," p. 53.

110.    In short, Meta employees and Meta leadership know that Instagram is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and the parents of its tens of millions of child and teen users.

111.    Meta advertises its product as "free," because they do not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties.

112.    The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety.

113.    Instagram is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users'

susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" in Stories). This design is unreasonably dangerous to the mental well-being of underage users' developing minds.

114.    Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Instagram's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities.

115.    Meta knows that is product is addictive, and it knows that millions of teen users want to stop using Instagram but cannot.

116.    Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

117.    For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, which started in 2014 and ran until recently, and the primary purpose of the Summit was to learn how to make products more habit forming.

118.    Meta's Terms of Use also state that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." Yet, that is not the truth. Meta *does* have the technology to protect its users, but only employs that technology when and to the extent it can do so without decreasing user engagement and its own profits.

119.    Meta also engineers its product to keep users, and particularly young users, engaged

longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

120.   Meta spends billions of dollars marketing its products to minors and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**D.   Meta Has Designed Complex Algorithms to Addict Teen Users and Its Business Model is Based on Maximizing User Screen Time**

121.   Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

122.   Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop. *See,* Section B, *supra*.

123.   One of these features, present in Instagram, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue.

124.   Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

125.   In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

126.    The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users.

127.    Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

128.    Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

129.    Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

**E.    Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

130.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

131.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

132.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

133.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

134.    The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency

caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

## F.    Meta Misrepresents the Addictive Design and Effects of its Social Media Product

135.    At all times relevant, Meta has advertised and represented that its product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

136.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like Alex Martin. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

## G.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties

137.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

138.    Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis.

139. Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

140. It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

141. On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

142. Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

143. Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. According to public statements made by the Facebook Whistleblower and other departed Meta employees, Meta's Integrity Team routinely flags these types of issues for Meta leadership and are consistently ignored.

144. Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Instagram product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Meta,

    a. Designed and constantly redesigns its Instagram product to attract and addict teens and children, its "priority" user group.

    b. Designed and continues to operate its Instagram product to ensure that teens and children can obtain unfettered access, even over parental objection.

    c. Knows when teens and children are opening multiple accounts and when they are

accessing its product excessively and in the middle of the night – which Meta considers to be a "value add proposition."

    d.   Works with advertisers and influencers to create and approve harmful content and provides direct access to its "acquired" teens and children – a user population Meta itself recognizes as being "vulnerable."

    e.   Operates and provides the above Instagram product with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving algorithm programming that promotes harmful content over clear dangers to user safety.

145.    While it may be a third-party creates a particular piece of harmful content, the teens and children harmed by Instagram are not being harmed by a single piece of harmful content. They are being harmed by Instagram's algorithmic programming and business decisions to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

146.    Alex Martin and children like her do not open Instagram accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram and/or secret Instagram accounts, losing control and becoming irritable, and feeling like they want to stop using Instagram but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Instagram's minor users.

147.    Alex Martin and children like her do not start using Instagram in the hopes of being exposed to product features that cause harm to them. Yet Instagram use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms Meta itself has acknowledged repeatedly in internal documents.

148.    The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to

Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

149.    Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

150.    Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts) meant to ensure easy access by children and teens, irrespective of parental consent.

151.    Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this.

152.    Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[23]

---

[23] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

**Senator Mike Lee: (01:21:34)**
Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.

**Senator Mike Lee: (01:22:31)**
I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

153.    In other words, Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

154.    Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[24] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Meta] can push teens into darker and darker places."[25] Meta "knows that its amplification algorithms, things like engagement

---

[24] *See* https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

[25] *Id.*

based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[26] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety."[27]

155.   Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain.

156.   None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

157.   Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

158.   None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

> a.   Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.
>
> b.   Not permitting any targeted advertisements to any user under the age of 18.
>
> c.   Fixing or removing all features that currently do not implement the tools Meta uses

---

[26] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.

[27] *Id.* at 02:47:07.

to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

d.  Prioritizing internally its removal of harmful content over the risk of losing some user engagement – i.e. users who might be offended when Meta takes down what it believes to be harmful content.

e.  Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account. This is something teens have even asked Meta to do *for their safety*, "

f.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Instagram and does not stop bad actors.

g.  Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

h.  Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

i.  Launching Project Daisy and Pure Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

j.  Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k.  Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

l.  Not permitting direct messaging with any user under the age of 18 if that minor

1    user is not already on a user's friend list.

2      m. Requiring parental consent and restricting account access for users under the age of

3       18 to prevent usage at night and during regular school hours.

4      159. These are just some examples, all of which could be accomplished easily and/or at

5    commercially reasonable cost. Meta itself has discussed and considered many of these, but its

6    leadership ultimately declined to make such product changes because such changes—while better

7    for the health and wellbeing of Instagram users—could result in a relatively small decrease to

8    Meta's more than $200 billion in annual revenue.

9          **V.**   **PLAINTIFF-SPECIFIC ALLEGATIONS**

10     160. Alex Martin was born February 17, 2003, and grew up in Georgetown, Kentucky.



27     161. She was an outgoing and athletic child, who loved school and excelled at school,

28   and enjoyed sports and spending time with her group of friends, many of whom she had known

since kindergarten. She wanted to work in the health care field when she grew up, so that she could make peoples' lives better.

162.    Alex got her first cell phone when she was 12, as she started riding the bus and her parents wanted to make sure that she had a way to contact them. Instagram was the first application she downloaded onto her new phone, and she was very excited about opening an account as all her friends had one. Alex knew she had to say that she was 13 to open an account, but that it was not an issue and that she could still tell people her real age on Instagram. In fact, it is relatively common for kids to open an account before 13 then put their actual age in their bio and elsewhere, and the general understanding is that Instagram doesn't care and won't do anything about it.

163.    Plaintiffs at the time believed that Instagram was like Facebook for kids and was used primarily by kids to coordinate social events, stay in touch, and post fun photos. They reasonably believed Alex would be safe as long as she stayed away from strangers.

164.    Ben Martin is a police officer and spoke with his daughter about the responsibility of a phone, and the potential danger of strangers when using any product that allowed for interaction with strangers. He made sure she understood to not engage with people she did not know and to not send suggestive photos to anyone via her phone or social media. Alex's parents had this conversation with her more than once, and regularly checked in to make sure that everything was okay. And in 2014 and 2015, everything seemed to be okay.

165.    Alex was still a star student, and still enjoyed school, participating in dance and cross country, and spending time with her close group of friends. However, she also started sneaking out at night to get her cell phone. Her parents did not allow Alex to keep her cell phone with her at night, so she would wait until they fell asleep, sneak out and get her phone, stay up all night on social media, and make sure to put her phone back before her parents were awake. In short, unbeknownst to Alex and her parents, she was addicted to Instagram and that addiction was slowly worsening.

166.    In 2012, Meta purchased Instagram for $1 billion dollars and began making significant changes to the Instagram social media product. In 2016 alone, Meta made it easier to switch between multiple accounts (February 2016), switched its Feed from chronological to

algorithmically-driven (March 2016), and launched of Instagram Stories (August) – a feature Meta designed to be like Snapchat Stories because of Snapchat's success with teens.

167.   Ben and Jennifer Martin were not aware of Meta's changes and continued to reasonably rely on Meta's representations that its product was safe and Meta's continued distribution to children and teens. They had no reason to think that Meta was knowingly making and distributing harmful products to anyone, much less to kids. But in 2016, as Meta continued implementing more addictive and more harmful product features in its goal to increase engagement, everything changed for Alex and her parents.

168.   It was also understood that Instagram wouldn't close your account for being under 13, you just had to say you were 13 when opening an account and could then put your real age in your bio. In fact, this is something many kids do even to this day. It was also understood that Instagram did not object to kids using more than one account, which made it easier to hide more personal content and the existence of secondary accounts from parents and family—which accounts Instagram and its young users refer to as FINSTAs (short for "fake Instagram").

169.   In 2015 or 2016, Alex opened her second Instagram account, which account her parents did not know about.

170.   Alex had as many as three Instagram accounts at any given time, and occasionally opened new accounts, for example, when she forgot her password and would get logged out. Having to open a new account was a hassle, but Instagram didn't verify email so kids, including Alex, often used fake emails or created email accounts solely for the purpose of opening secondary Instagram accounts. This made it difficult to retrieve passwords when accidentally logged out of an account and, on information and belief, Meta knew and this happens often, *i.e.* short lived multiple accounts resulting from the user not having access to the email used to sign up. In fact, Alex did not even open an email account, she simply typed random letters and added an @yahoo or @gmail, and Meta allowed her to open Instagram accounts anyway.

171.   In 2016, Meta's algorithm exposed Alex to massive amounts of eating disorder and other unhealthy content, including pro-ana content, as well as social comparison product features. Alex began using Instagram more. She received recommendations for pro-ana groups and content

to follow and spent hours looking at that content. Alex started by eating healthier, then eating less and exercising more, fueled on by the images that Meta's algorithm bombarded her with in her Feed, Stories, and Explore. She began thinking that she wasn't good enough, and that she needed to look like the models she saw on Instagram.

172.    She also got anxious and depressed every time she tried to post something on her account, afraid that it wouldn't get enough likes and, as time went on, she began to feel worse and worse about herself. She obsessed over likes every time she posted. For example, if she posted one thing and received ten "likes" in a minute, then the next time she posted, if it received only five "likes" in a minute she would delete the post. It became a higher and higher bar for Alex to feel good about herself, and one that eventually was impossible to reach. Her day and her mood turned on those posts and how much people liked them, which eventually destroyed her confidence and self-esteem both on Instagram and in the world outside of Instagram.

173.    Her parents began noticing changes in August or September of 2016. Alex was always active in sports and dance, so regular exercise was typical for her. However, in the Fall of 2016 she started exhibiting symptoms of anxiety and began withdrawing from spending time with her friends. She went through phases of depression and her exercise routine became more and more extreme. At the same time, she started eating less which is when her parents realized something was going on – however, Alex told them everything was fine.



Jennifer, Alex, and Ben (September 3, 2016)

174.     Alex would make up what she had eaten that day, so that her parents did not worry. She would take food out of wrappers and hide the food at the bottom of the garbage can, while putting the empty wrappers at the top. She would pretend to eat at dinner with her family, but then spit food into her napkin or feed it the family's dogs.

175.     By November of 2016, Alex was noticeably thinner. She is 5 foot tall and went from about 110 pounds in mid-2016 to under 100 pounds in November 2016. Ben and Jennifer Martin took Alex to a doctor, and she was referred to a dietician.

176.     They thought things were getting better, but Alex was not gaining weight. In fact, in the next month she lost more than another ten pounds and her parents took her to the emergency room in December 2016.



Alex (December 26, 2016)

177.   Alex's resting heart rate was in the 20s and the doctors told her parents that her heart was failing. Alex stayed in the hospital for 21 days, in the hopes that they could get her heart stronger. She was also diagnosed with anorexia at that time.

178.   When Alex was released from the hospital, in late December 2016, she began seeing a therapist and continued seeing a dietician. She also started keeping journals and set goals for the year to come. Her goals included (1) running a half marathon before the years' end so that she could "achieve something big," (2) making the high school dance team because "I love to dance," (3) continuing her 4.0 GPA in school so that she could "get a scholarship," (4) living in the moment so that she would be "more happy," (5) becoming closer to God because "he is the most important," (6) building stronger relationships with friends and meeting new people "so I'm not lonely," and (7) becoming better at photography "to get good at a new hobby."



179.   However, by January of 2017 she still wouldn't eat. No matter how hard she tried, Alex could not stop comparing herself to the images Instagram's algorithm promoted, amplified, and bombarded her with, which she had come to think of as the norm and the way she was supposed to look, which meant not eating food. Whenever she tried to eat, Alex saw those images.

180.   In January 2017, Alex's doctors told Ben and Jennifer that Alex required inpatient treatment immediately. There were no facilities in Kentucky, so they were referred to Veritas Collaborative in Durham, North Carolina. Veritas did not permit patients to have cell phones, which turned out to be much needed break for Alex. At first it was difficult. Alex felt like something was missing, but eventually it started to feel like a weigh lifted off her shoulders. She started to feel better, felt like she could think clearly again, and began to accept that what she was doing was unhealthy and that she needed to try to eat.

181.   During this time, Alex's parents drove to North Carolina every other weekend and would stay in a hotel so that they could visit Alex, which caused them financial hardship.

182.    Then, in May 2017, Alex transitioned to outpatient care and her parents rented an apartment for five weeks for that purpose and so that they could stay with her during the transition. She was discharged home to Kentucky in June 2017, where she continued with intensive outpatient therapy and her dietician.



Alex, Ben, Christian, and Jennifer (June 4, 2017, post-discharge from Veritas Collaborative)

183.    Alex finally seemed to be doing better. She did not want to keep seeing the images Instagram pushed at her via her Instagram accounts, but it was a daily struggle to stay off Instagram. Several times Alex tried to stop using Instagram. She would delete the application from her phone then get it back then delete it and get it back again. She was afraid that no one would know who she was without Instagram, but she also knew that she felt better without Instagram.

184.    Alex also opened a "recovery" account during this time – which is an Instagram account she opened to try to focus on recovery from her eating disorder and connect with others who were in recovery. Instead, however, this account made things worse as Instagram kept sending her the same images, and the same harmful content and recommendations.

185.    This went on for almost two years then, in May of 2019 Alex attempted to commit suicide by overdosing on pills.

186.    Alex was hospitalized medically for ten days then transferred to Good Samaritan Psych Ward for two days, when her parents fought to bring her home. Leaving their daughter in the psychiatric facility was one of the most difficult things her parents ever had to do, and it pained them to see her there. They brought her home and continued to take her to therapy and other medical services but did not know what they could do to help her. None of this made sense.

187.    In November 2019, Alex tried to commit suicide a second time, also with pills, and was admitted to Good Samaritan for five days. After that Alex got back in recovery, attended her therapist and dietician appointments, and started to get better … until she relapsed in May of 2020 and then started eating and purging (bulimia). After Ben and Jennifer found out about the bulimia, they got her admitted to a facility in Tennessee called Fairhaven, and she was admitted for inpatient treatment until sometime in July 2020.

188.    Alex did not have access to Instagram at Fairhaven either. A few months after being released from Fairhaven, Alex made the difficult decision to delete her Instagram account for good, by deleting the account itself and not just the application on her phone.

189.    Through her use of Instagram Alex also received explicit sexual communications and images from adult users and was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult users of Instagram. These adult users are encouraged to use Instagram to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for new users or implement feasible safeguards to protect minor users from receiving inappropriate sexual content.

190.    At all times relevant, Meta knew that some of its Instagram users would become addicted to). Meta also knew that children and teenagers would be particularly susceptible, and Meta knew or should have known what an addiction like this would do those children and teenagers and their families.

191.    Alex's social media use coincided with a steady, but severe, decline in her mental health. She was addicted to Instagram and could not stop using Instagram, even when the social

media product was directing increasing amounts of harmful content and amplifying that harmful content via Alex's Instagram accounts and product features. Specifically, Alex was repeatedly bombarded with and exposed to content recommended and/or made available to her by Meta, which increasingly included underweight models, unhealthy eating, and eating disorder content.

192.   From 2012 through 2015, Meta developed and implemented technologies and features designed to increase engagement (and its own profits) but which were harmful to users, including Alex Martin. This included but is not limited to things like new advertising features, which allowed advertisers to target Alex based on her age, location, gender, and other characteristics. Meta failed to exercise reasonable care to ensure that the advertisements were safe. Meta profited from its advertising practices and product features, while Alex was exposed to and harmed by harmful advertising content. For example,

    a. Alex was only 12 when she opened her first Instagram account and, as such, was particularly vulnerable and the impact of her developing addiction to Instagram and the harmful content Instagram was amplifying was made worse as a result.

    b. Meta designed its Instagram product to default minors to public profiles, exposing 12-year-old Alex to inappropriate sexual content and serving her up for access to complete strangers who Meta knew posed the risk of bullying and exploitation.

    c. Instagram's product design, including things like search and explore and photo editing and filtering features, and Instagram's emphasis on advertiser content caused Alex to question her appearance and worth, and made her increasingly anxious and depressed.

193.   In 2016, Meta added several additional product features that Meta knew or should have known would be harmful to minor users of its Instagram product. For example,

    a. In February 2016, Instagram started enabling users to easily switch between multiple accounts. Alex opened FINSTAs (secret Instagram accounts) and Meta exposed Alex to addictive design, harmful advertising, and other, Meta-backed content through those accounts too.

    b. In February 2016, Instagram added view counters to videos, increasing the social

comparison harms already caused to Alex by Instagram.

c. In March 2016, Meta switched its feed from chronological to algorithm-driven ordering. Alex no longer simply saw posts made by "friends" in the order they were made but, instead, Meta prioritized and escalated certain posts and content in Alex's Instagram feed. More specifically, it promoted and prioritized harmful content based on the determination that such content was more likely to keep Alex's attention, thereby increasing her use of its product and its resulting revenue. While Meta's prior product design was pushing constant social comparison and eating disorder content to Alex, the new design bombarded her with it and Alex's exposure to super thin models and eating disorder increased exponentially.

d. In August and November 2016, Instagram implemented Stories and Live product features, respectively, which again increased Alex's exposure to harmful content, as well as her social pressure to participate and engage with Instagram.

e. In December 2016, Instagram implemented the ability to mark comments as liked, which was initially available only on the mobile application, which is how Alex accessed Instagram most of the time by 2016—via her cell phone. The "like" feature was particularly harmful to young users, as Meta discovered, and this product feature resulted in increased feelings of depression, anxiety, and low self-worth.

194. The more Alex accessed and used the Instagram social media product, the worse her mental and physical health became, which eventually included a life-threatening eating disorder and two suicide attempts.

195. Alex had always been slender but after Instagram's algorithm and design started pushing extreme weight loss content and bulimia purging instructions and recommending pages featuring excessively thin models, Alex became obsessed with her weight and, at one point, weighed less than 80 pounds. At one point, Alex's Explore page was filled with nothing but overly thin models and thigh gaps.

196. Meta amplified and pushed Alex toward harmful content through various

recommendation mechanisms built into its Instagram product. For example, Meta sent Alex recommendations to eating disorder themed pages and groups. Meta also sent Alex recommendations for "friends" who were, in fact, adult Instagram users either suffering from these mental health issues themselves or using the Instagram product to find and exploit young girls; and, likewise, Meta recommended Alex to these same types of adult users, who then sought to connect with her. These product features are harmful to a significant percentage of Instagram users, particularly teens and young women

197.  Meta also harmed Alex through specific product features like direct messaging and group chat. For example, Instagram's Direct Message and group chat features allowed adult users to message Alex directly. These product features are harmful to a significant number of underage users. They also are not necessary to Instagram's operation and are features Meta can restrict and/or disable – but Meta makes calculated and economic-based decisions to keep them in place because Meta knows that restricting or disabling them would negatively impact engagement.

198.  Meta was providing Alex with constant, harmful access to multiple Instagram accounts, and had designed and was operating Instagram in a manner that ensured that there was nothing Alex's parents could do to protect her – in fact, her parents did not even know the source of the harm, nor could they have discovered it given the degree to which Meta was concealing its findings from the public. Meta did not disclose the fact of its addictive design and its own efforts to addict young children and what it was learning about the harm its specific product features were causing to children and teens—the precise types of harms that were now happening to Alex because of Instagram.

199.  Alex's parents had no way to determine Instagram's role in Alex's ongoing battle with severe depression, anxiety, self-harm, and eating disorders.

200.  Alex, once an A student, struggled to graduate from high school. She spent some of her high school years doing on-line school because of her treatment, as well as alternative school. Then she almost did not graduate due to a class she was failing, which she was able to test out of just before graduation. But also, Alex lost her lifelong friendships. She began pulling away from those friends when her eating disorders became known and they from her. Her friends did

not know how to help her and felt powerless and scared, as did Alex.

201.    Alex did graduate from high school, in May of 2021, and started at University of Kentucky in August 2021. Alex had dreamed of running in college, but that was no longer an option. She had stopped with sports in high school and for long periods could not participate in sports because of her eating disorder. She lost significant stamina and strength and began suffering from severe social anxiety. Where Alex was once outgoing, she began having difficulty going to the grocery store. She also no longer thought about the future and what she wanted to be when she grew up. Her life became a day-to-day struggle to survive, as it had become for her parents who were there with her every step of the way.

202.    Alex did not get scholarships and is not on track for a career in health care, but she is in school and, being Instagram-free for the last year, she got a 3.7 GPA her first year of college.

203.    She also now struggles with social interactions, especially ones that involve meals, and while she tries to make plans with colleagues, those often fall through due to the anxiety and fear Alex feels when trying to navigate social situations.

204.     Alex is aware of the challenges ahead and works hard every day to not slip back into her eating disorder.

205.    Alex's addiction and resulting mental health disorders were the proximate result of the unreasonably dangerous Instagram product Meta made accessible to her and that she used. As set forth in detail below, Meta's products were not reasonably safe due to their defective design and inadequate warnings.

206.    To this day, Meta has actively concealed the fact and has "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public."[28] Meta "intentionally"[29] hid vital information in its possession from the public, the US government, and governments, including information relating to the safety of children and the role of its algorithms and other Instagram product features in causing addiction, depression, anxiety, eating disorders, and other harms.

---

[28] October 5, 2021, Senate Hearing Transcript, Mr. Chairman Blumenthal at 00:05:21.

[29] Id. at 00:29:25.

207.    Meta made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."[30]

208.    Plaintiffs did not discover, or in the exercise of reasonable diligence could not have discovered, that Alex's addiction, depression, anxiety, eating disorders, attempted suicides, and other harms were caused by Meta's unreasonably dangerous products until June of 2022, when they saw Alexis Spence and Kathleen Spence on the news talking about the harms suffered by Alexis Spence due to Instagram.

209.    Alex disaffirms all contracts Instagram may purport to have with her and does not currently have an Instagram account.

210.    As a result of Alex Martin's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, she had to undergo professional counseling, inpatient programs, outpatient programs, and eating disorder programs.

211.    Alex must stay in constant contact with doctors and dieticians, fights to stay in recovery every day, and will suffer permanent mental and emotional damages because of what Instagram has done. Long term physical damage is also likely, and Alex suffers from lapses in her memory during her periods of illness.

212.    These harms are a direct and proximate result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom.

213.    But also, Alex's parents have suffered medical conditions as a direct result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom. This includes blood pressure mediation Jennifer Martin was put on while Alex was at Veritas and for stress-related high blood pressure, as well as a second anxiety medication she was prescribed in 2020 just after Alex relapsed. Likewise, in 2020 and amidst Alex's relapse, Ben Martin was prescribed anxiety medication. Both of her parents have done everything they can to help keep Alex alive, and what the Instagram product has done to their

---

[30] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen, at 00:32:20.

daughter has taken an incredible emotional, financial, and physical toll on their lives, as one would expect and as Meta could and should have anticipated.

## VI.     PLAINTIFFS' CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

214.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 213 as if fully stated herein.

215.    Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

216.    Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical harm to minor users.

217.    Meta's product was unreasonably dangerous because it contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Meta solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on its product.

### A.     Inadequate Safeguards From Harmful and Exploitative Content

218.    As designed, Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. The cost of designing Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high

in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

219.    Meta also engages in conduct, outside of the algorithms themselves, that is designed to promote harmful and exploitative content as a means of increasing its revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

220.    Reasonable users (and their parents) would not expect that Meta's product would knowingly expose them to such harmful content and/or that Meta's product would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users, like Alex Martin.

**B.    Failure to Verify Minor Users' Age and Identity**

221.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

222.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

223.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

224.    Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain

with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

225.    By way of example only, Meta has dashboards that enable it to identify and track every detail of user activity by date, location, and age—not the age provided to Meta upon account opening, but rather, "Age prediction" technologies Meta has developed and that can determine age with reasonable certainty based on user data, online activity, and/or similar sources of information Meta collects with regard to every Meta user on a constant and ongoing basis.

226.    Again, Meta exercises an unprecedented level of control over its users and possesses and unprecedented level of knowledge—including the estimated actual age of each user, irrespective of what a user states when opening an account. Meta cannot, in good faith, disclaim knowledge or responsibility for the harms its social media product is causing, including the harms it caused to Alex Martin and that are at issue in this Complaint.

227.    Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers.

228.    The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.    Inadequate Parental Control and Monitoring**

229.    Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

230.    Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.      Intentional Direction of Minor Users to Harmful and Exploitative Content**

231.    Default "recommendations" communicated to new teenage users, including Alex Martin, purposefully steered her toward content Meta knew to be harmful to children of her age and gender.

232.    Ad content pushed to new teenage users, including Alex Martin, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.      Inadequate Protection of Minors from Sexual Exploitation and Abuse**

233.    Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

234.    Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

235.    Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

236.    Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

**F.      Design of Addictive Social Media Products**

237.    As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their

euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

238.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

239.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

240.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving);

(4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

241.   The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

242.   BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.   You spend a lot of time thinking about social media or planning how to use it .

    b.   You feel an urge to use social media more and more.

    c.   You use social media in order to forget about personal problems.

    d.   You have tried to cut down on the use of social media without success.

    e.   You become restless or troubled if you are prohibited from using social media.

    f.   You use social media so much that it has had a negative impact on your job/studies. Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction

243.   Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of

addictive gaming promulgated in DSM 5 and include:

244.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability), including,

     a.   Tolerance, the need to spend more time using social media to satisfy the urge.

     b.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

     c.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

     d.   Continuing to use social media despite problems.

     e.   Deceiving family members or others about the amount of time spent on social media.

     f.   The use of social media to relieve negative moods, such as guilt or hopelessness.

     g.   Jeopardized school or work performance or relationships due to social media usage.

245.    Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

246.    It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

247.    At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

248.     Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

249.     It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

250.     Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

251.     Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

252.     Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

253.     As a proximate result of these dangerous and defective design attributes of Meta's product, Alex Martin suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until 2022.

254.     As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs Ben and Jennifer Martin, have suffered emotional distress and pecuniary hardship due

to their daughter's mental harm resulting from her social media addiction.

255.   Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

256.   Plaintiffs reallege each and every allegation contained in paragraphs 1 through 255 as if fully stated herein.

257.   Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

258.   Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

259.   Meta's social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

260.   The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

261.   The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

262.   Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen

time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

263. It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

264. Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

265. As a result of Meta's failure to warn, Alex Martin suffered severe mental harm, leading to physical injury from her use of Instagram.

266. As a result of Meta's failure to warn, Plaintiffs Ben and Jennifer Martin, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

267. Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

268. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 267 as if fully stated herein.

269. At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as Alex Martin.

270. Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and

overcome emotional and psychological harm from negative and destructive social media encounters.

271.   As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

272.   As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

273.   Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Alex Martin using its Instagram product.

274.   Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

275.   Meta is negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

276.   Meta is negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

277.   Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

278.   As a result of Meta's negligence, Alex Martin suffered severe mental harm from her use of Instagram.

279.   As a result of Meta's negligence, Plaintiffs Ben and Jennifer Martin have suffered

emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

280.     Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Alex Martin, whom they knew would be seriously harmed through the use of its social media product.

## COUNT IV - VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

281.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 280 as if fully stated herein.

282.     Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

283.     The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

284.     Defendant's conduct is unlawful as set forth in Counts I–III, above.

285.     Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13

286.     Defendant engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Alex Martin, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had Ben and Jennifer Martin known of the dangerous nature of Defendant's product, they would have taken early and aggressive steps to stop or limit their daughter's use of Defendant's product.

287.     Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

288.     Defendant's conduct has resulted in substantial injuries that Plaintiffs could not

reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

289.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

290.    As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

291.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

### COUNT V – UNJUST ENRICHMENT

292.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 291 as if fully stated herein.

293.    As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from Alex Martin's problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

294.    It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendant's acts and omissions described herein.

295.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

### COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

296.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 295 as if fully stated herein.

297.    Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate

parents' ability to monitor and control their children's social media usage.

298.    These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

299.    Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

300.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## COUNT VII – FRAUD and FRAUDULENT CONCEALMENT

301.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 300 as if fully stated herein.

302.    At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Instagram social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

303.    Defendants marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Instagram product was safe, improved social connectivity, and improved the mental and physical health of its users. For example, in April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[31]

304.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to

---

[31] https://www.youtube.com/watch?v=AB4mB-K7-xY

Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[32]

305.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[33]

306.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[34] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[35]

307.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[36] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[37] He testified that Meta's overarching goal is child safety.[38]

308.    Meta's Terms of Use also represent that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

---

[32] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[33] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[34] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[35] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[36] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[37] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[38] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

309.    The above statements are indicative and reflective of the deceptive and/or misleading statements Meta has been feeding to the public for years in order to convince people that its products were safe for use by teenagers, like Alex Martin. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like Alex Martin.

310.    Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

311.    Meta lied about the harm its products are causing.

312.    Meta's omissions were also misleading and deceptive in every respect, for example, talking about how Instagram makes some users' lives better and ignoring the fact that Instagram is causing serious harms to other users, including but not limited to what Meta calls SSI, Suicide and Self-Injury. Meta failed to disclose, and spent years actively concealing, the fact that its social media products cause addiction, sleep deprivation, anxiety, depression, anger, eating disorders, self-harm, suicidal ideation, and suicide, among other harms.

313.    These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the public, including plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Meta for monetary damages for the following harm:

1. Past physical and mental pain and suffering of Alex Martin, in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of Alex Martin.

3. Past and future medical expenses of Alex Martin.

4. Past physical and mental pain and suffering of Ben and Jennifer Martin, in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by Ben and Jennifer Martin.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief.

9. For such other and further relief as this Court deems just and equitable.

1    DATED this 25th day of July 2022.

2                                    SOCIAL MEDIA VICTIMS LAW CENTER
                                     PLLC
3

4                         By: _____
                                Laura Marquez-Garrett, SBN 221542
5                               laura@socialmediavictims.org
                                Matthew Bergman
6                               matt@socialmediavictims.org
                                Glenn Draper
7                               glenn@socialmediavictims.org
                                821 Second Avenue, Suite 2100
8                               Seattle, WA 98104
                                Telephone: (206) 741-4862
9                               Facsimile: (206) 957-9549

10

11                              SEEGER WEISS LLP
                                Christopher A. Seeger
12                              cseeger@seegerweiss.com
                                Christopher Ayers
13                              cayers@seegerweiss.com
                                55 Challenger Road
14                              Ridgefield Park, NJ 07660
                                Telephone: 973-639-9100
15                              Facsimile: 973-679-8656

16                              Robert H. Klonoff
17                              klonoff@usa.net
                                2425 S.W. 76th Ave.
18                              Portland, Oregon 97225
                                Telephone: (503) 702-0218
19                              Facsimile: (503) 768-6671

20                              Attorneys for Plaintiffs

21

22

23

24

25

26

27

28